## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KAMIL KUKLINSKI, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:  3:21-cv-01425-SPM |
| BINANCE CAPITAL MANAGEMENT CO., LTD. d/b/a BINANCE, BAM TRADING SERVICES INC. d/b/a BINANCE.US and JUMIO CORPORATION, | ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT BAM TRADING SERVICES INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................... 1

LEGAL STANDARD................................................................................................... 2

ARGUMENT ............................................................................................................... 2

    I.      THE ILLINOIS BIOMETRIC INFORMATION PRIVACY ACT APPLIES TO BAM ................................................................................................................... 2

        A.      This Court should deny Defendant BAM's Motion to Dismiss Because BAM is not a Financial Institution subject to the GLBA .......................... 3

            1. BAM does not fall within the definition of a "financial institution" under 12 U.S.C.A. § 1843(k)................................................................. 4

            2. Per §1843(k)(5) the Board of Governors of the Federal Reserve System is required to define activities as being financial in nature when they do not involve money or a security. Cryptocurrency is neither. ................ 6

            3. The Board of Governors of the Federal Reserve System has not determined by Order which was in effect on November 12, 1999 that BAM's Activity is closely related to banking ....................................... 7

            4. Even if BAM is found to be a "financial institution" under 12 U.S.C.A. § 1843(k), it cannot fall within exception 25(c) of BIPA because GLBA regulators lack rulemaking authority for cryptocurrency exchanges and there are no "rules promulgated thereunder" ....................................... 9

        B.      Plaintiff has adequately pled his BIPA violations against BAM and BAM's Motion to Dismiss should be denied............................................ 11

            i.   The Conduct Alleged Occurred Primarily and Substantially in Illinois ...................................................................................... 11

            ii.  The Choice of Law Provision in BAM's Terms of Use Does Not Apply Because Plaintiff Was Never Presented With Them, Required to Manifest Any Affirmative Assent to Them, or Even Informed That They Exist ....................................................................................... 14

            iii. The Class Action Waiver is Unenforceable for the Same Reason as the Choice of Law Provision ............................................................... 19

            iv. Plaintiff Has Stated a Claim for Unjust Enrichment........................... 19

CONCLUSION......................................................................................................... 19

## **TABLE OF AUTHORITIES**

### **Cases**

*Applebaum v. Lyft, Inc.*,
  263 F. Supp. 3d 454 (S.D.N.Y. 2017) ..................................................... 15

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)............................. 2

*Atwal v. NortonLifeLock, Inc.*,
  2022 WL 327471 (W.D.N.Y. Feb. 3, 2022) ......................................... 5, 6

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)............................. 2

*Carlson v. CSX Transportation, Inc.*,
  758 F.3d 819 (7th Cir.2014) ..................................................................... 2

*Commodity Futures Trading Comm'n v. McDonnell*,
  287 F. Supp. 3d 213 (E.D.N.Y.) ............................................................ 10

*Commodity Futures Trading Comm'n v. Thompson*,
  2020 WL 7122013 (S.D.N.Y. Oct. 1, 2020)............................................. 4

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
  885 F. Supp. 2d 894 (S.D. Ill. 2012) ...................................................... 17

*Eckhardt v. State Farm Bank FSB*,
  2019 WL 1177954 (C.D. Ill. Mar. 13, 2019).......................................... 4

*Sec. & Exch. Comm'n v. Telegram Grp. Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................................... 7

*Fischer v. Instant Checkmate LLC*,
  2021 WL 3033586 (N.D. Ill. July 19, 2021) .......................................... 17

*Forby v. One Techs., LP*,
  2016 WL 11746078 (S.D. Ill. Mar. 25, 2016) ........................................ 17

*Forest Preserve Dist. Of Du Page County v. Brookwood Land Venture*,
  229 Ill.App.3d 978 (2d Dist. 1992) ........................................................ 14

*Hogan v. Amazon.com, Inc.*,
  2022 WL 952763 (N.D. Ill. Mar. 30, 2022) ........................................... 18

*In re Facebook Biometric Information Privacy Litigation*,
  185 F.Supp. 3d 1155 (N.D. Cal. 2016) ................................................... 18

*McGoveran v. Amazon Web Servs., Inc.*,
  2021 WL 4502089 (D. Del. Sept. 30, 2021) ........................................... 13

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) ..................................................................... 15

*Miracle-Pond v. Shutterfly, Inc.*,
  2020 WL 2513099 (N.D. Ill. May 15, 2020)........................................... 17

*Monroy v. Shutterfly, Inc.*,
  2017 WL 4099846 (N.D. Ill. Sept. 15, 2017) ......................................... 12

*Orders Issued Under Section 4 of the Bank Holding Company Act*,
  81 Fed.Res.Bull. 1130, 1995 WL 736783 ................................................ 7

*Patterson v. Respondus, Inc.*,
  2022 WL 860946 (N.D. Ill. Mar. 23, 2022) ...................................... 10, 18

*Rivera v. Google Inc.*,
   238 F. Supp. 3d 1088 (N.D. Ill. 2017) ................................................................. 12, 13
*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*,
   786 F.3d 510 (7th Cir. 2015) ............................................................................................ 2
*Sgouros v. TransUnion Corp.*,
   2015 WL 507584 (N.D. Ill. Feb. 5, 2015) ..................................................................... 14
*Sgouros v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016) ............................................................................... *passim*
*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ........................................................................................... 2
*Tucker v. Chase Bank USA, N.A.*,
   399 F. Supp. 3d 105 (S.D.N.Y. 2019) ............................................................................. 5
*Van Tassell*,
   795 F. Supp. 2d ............................................................................................................. 15
*Vance v. Int'l Bus. Machines Corp.*,
   2020 WL 5530134 (N.D. Ill. Sept. 15, 2020) ............................................................... 13
*Wilson v. Redbox Automated Retail, LLC*,
   448 F. Supp. 3d 873 (N.D. Ill. 2020) ................................................................ 15, 16, 18
*Womack v. Brady Mccasland, Inc.*,
   2016 WL 1117086 (S.D. Ill. Mar. 22, 2016) ................................................................. 19

## Statutes

7 U.S.C.A. § 7b-2 (West) ...................................................................................................... 11
12 U.S.C.A. § 1843(k) .................................................................................................. *passim*
12 U.S.C.A. § 1843(k)(4)(A) ......................................................................................... 4, 5, 6
12 U.S.C.A. § 1843(k)(4)(F) ............................................................................................ 7, 8
12 U.S.C.A. §1843(k)(5) .................................................................................................. 1, 6
12 U.S.C.A. § 1843(k)(5)(A) ................................................................................................ 7
15 U.S.C.A. § 6801(b) .......................................................................................................... 9
15 U.S.C.A. § 6809(3)(B) (West) .................................................................................. 10, 11
15 U.S.C.A § 6809(3)(A) ...................................................................................................... 4
740 ILCS 14/1 ...................................................................................................................... 3
740 ILCS 14/25(c) ................................................................................................................ 3

## Rules

Fed. R. Civ. P. 12 .................................................................................................................. 2
Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 1, 2

Plaintiff Kamil Kuklinski, individually and on behalf of all others similarly situated, by and through his attorneys, respectfully submits this Memorandum in Opposition to Defendant BAM Trading Services Inc.'s Motion to Dismiss Plaintiff's Amended Complaint and states as follows:

## PRELIMINARY STATEMENT

Defendant BAM Trading Services Inc. d/b/a Binance.US ("BAM") has filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). The motion should be denied as BAM has violated Illinois law under the Biometric Information Privacy Act (BIPA) and its arguments fail to satisfy the requirements of Rule 12(b)(6).

BAM first attempts to evade Illinois law by arguing that it meets the BIPA exception for "financial institutions." However, BAM is a cryptocurrency exchange and does not satisfy the definition of a "financial institution," as described in detail below.

The well-pled factual allegations demonstrate that BAM has violated BIPA. This conduct occurred primarily and substantially in Illinois, as BAM's software was installed on Plaintiff's iPhone and captured and processed his biometric data while Plaintiff was present and located at home in Illinois.  Plaintiff never assented to BAM's referenced Terms of Use ("TOU"), as Plaintiff has pled that BAM never made an attempt to obtain his consent to those terms and he was not required to manifest assent in order to create his account.  Therefore, the choice of law clause and class action waiver do not apply and cannot be enforced.

Finally, Plaintiff states a claim for unjust enrichment because users were improperly required to submit their biometric data to create an account with BAM. A user cannot trade on BAM's platform without first creating an account. Once a user does create an account, this

1

enables the user to confer benefits on BAM through Defendant's retention of fees from the sale and trade of digital assets.

## LEGAL STANDARD

The Defendant has filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). A 12(b)(6) motion alleges that, with regard to Plaintiff's complaint, that there is a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12 (West). In order to survive a 12(b)(6) motion the plaintiff's complaint must show facts that are "plausible rather than merely conceivable or speculative." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 526 (7th Cir. 2015). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court "must accept as true all factual allegations in the complaint." *Runnion* at 526 *citing Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 826 (7th Cir.2014). "[T]he court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

## ARGUMENT

### I.     THE ILLINOIS BIOMETRIC INFORMATION PRIVACY ACT APPLIES TO BAM.

BAM is subject to BIPA because: (1) As a cryptocurrency exchange, BAM does not fall within the definition of a "financial institution" as outlined within 12 U.S.C.A. § 1843(k); (2) per 1843(k)(5), The Board of Governors of the Federal Reserve System ("FRB") is required to define activities as being financial in nature when they do not involve "money or securities" and they have not done so for cryptocurrency; (3) The FRB has not determined by order that BAM's activities are "closely related to banking;" and (4) even if BAM did fall within the definition of a

2

"financial institution" outlined within 12 U.S.C.A. § 1843(k), GLBA[1] regulators lack rulemaking authority for cryptocurrency exchanges and thus there are no "rules promulgated thereunder" that govern BAM's activities.  These points are addressed in turn below.

> **A.** **This Court should deny Defendant BAM's Motion to Dismiss Because BAM is not a Financial Institution subject to the GLBA.**

In 2008, the Illinois legislature passed the Biometric Information and Privacy Act (740 ILCS 14/1 et seq.) to ensure that Illinois residents maintained control of their own basic biometric information. A pioneering law for consumers, this initiative was led in part by the American Civil Liberties Union of Illinois.[2] Section 15 of the Act mandated certain requirements for private companies who capture and collect this data, including scans of the hand or facial geometry. The integral requirements of BIPA include: 1) informing users that a biometric identifier or biometric information is being collected or stored, 2) informing them of the specific purpose and length or term for which a biometric identifier or information is being collected, stored and used, and 3) receipt of a written release executed by the user or subject of the biometric information.

Provided within BIPA are a set of exceptions in which the Act does not apply. One of those exceptions states that "[n]othing in this Act shall be deemed to apply in any manner to a financial institution or an affiliate of a financial institution that is subject to Title V of the GLBA and the rules promulgated thereunder." 740 ILCS 14/25(c).

Despite being launched in September of 2019, BAM did not self-proclaim that it was subject to the GLBA in their Privacy Policy until July 7, 2021. Not only did this self-proclamation occur *after* the allegations included within Plaintiff's complaint, but also *after*

---

[1] The Gramm-Leach-Bliley Act of 1999.
[2] https://www.aclu-il.org/en/campaigns/biometric-information-privacy-act-bipa (last visited April 24, 2022).

they had been creating accounts for Illinois residents for nearly two years. Within their Motion to Dismiss BAM has failed to offer any history outlining how the company has previously complied with any GLBA requirements. Not surprisingly, they have also not offered any argument detailing what the company has done with the biometric data they received, who it has been shared with, or how the measures taken satisfy either BIPA or the GLBA.

1.     **BAM does not fall within the definition of a "financial institution" under 12 U.S.C.A. § 1843(k).**

In arguing that the exception found in Section 25(c) of BIPA applies, BAM first argues that they meet the definition of a "financial institution" under the GLBA. A "financial institution" is defined generally under the GLBA as meaning "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." 15 U.S.C.A § 6809(3)(A). 12 U.S.C.A. § 1843(k) provides a list of activities considered "financial in nature." 12 U.S.C.A. § 1843(k). These activities include "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities." 12 U.S.C.A. § 1843(k)(4)(A).

Cryptocurrency eludes a cogent definition but has been referred to as "digital assets" and "digital tokens" as well as "crypto." Federal courts have recognized that "[c]ryptocurrency is a digital representation of value that can be digitally traded and functions as: (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value, *but does not have legal tender status*. "Unlike 'fiat currency,' like the U.S. dollar and the Euro, cryptocurrency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency." *Commodity Futures Trading Comm'n v. Thompson*, No. 19-CV-9052, 2020 WL 7122013, at *2 (S.D.N.Y. Oct. 1, 2020); *Eckhardt v. State Farm Bank FSB*, No. 1:18-CV-01180, 2019 WL 1177954, at *7 (C.D. Ill. Mar. 13, 2019) ("Plaintiff has plausibly alleged facts indicating cryptocurrency is unlike this definition of 'cash' and is instead more akin to a

4

good, such as software."); *Tucker v. Chase Bank USA, N.A.*, 399 F. Supp. 3d 105, 114

(S.D.N.Y. 2019) ("Because, as Plaintiffs plausibly allege, cryptocurrency does not imbue its

holder with a legal right to any government-issued currency, acquisitions of cryptocurrency

could not be classified as a cash-like transaction"); *Atwal v. NortonLifeLock, Inc.*, No. 20-CV-

449S, 2022 WL 327471, at *4 (W.D.N.Y. Feb. 3, 2022) (cryptocurrency "currently is not legal

tender").

BAM argues that they fall within the definition of "exchanging, transferring, and

safeguarding money." *Id.* As evidence, BAM provides reference to the company's TOU which

mention that users of their platform can conduct trades in the form of "(1) sale of a Digital Asset

for fiat or another Digital Asset; and (2) purchase of a Digital Asset with fiat or another Digital

Asset." (*See* BAM Ex. D. at 4-5). BAM thus implicitly suggests, without offering more, that

either selling a digital asset for legal tender or another digital asset or purchasing a digital asset

with legal tender or another digital asset is evidence of an "exchange" within the meaning of

financial activity of 12 U.S.C.A. § 1843(k)(4)(A), but fails to explain why the purchase or sale

of a digital asset, which is not legal tender, constitutes an exchange of "money" as opposed to

the purchase or sale of a retail good or commodity. Referring to the commodity at issue as an

"asset" does not change anything, as "[t]he label or terminology used to describe a digital asset

or a person engaging in or providing financial activities or services involving a digital asset . . .

may not necessarily align with how that asset, activity or service is defined under the BSA, or

under the laws and rules administered by the CFTC and the SEC."[3] Because of this, BAM does

---

[3] Heath Tarbert, Kenneth A. Blanco, Jay Clayton, *Leaders of CFTC, FinCEN, and SEC Issue Joint Statement on Activities Involving Digital Assets*, U.S. SECURITIES AND EXCHANGE COMMISSION (October 11, 2019), https://www.sec.gov/news/public-statement/cftc-fincen-secjointstatementdigitalassets#_ftn5 (last visited April 27, 2022).

not engage in "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities" as described under 12 U.S.C.A. § 1843(k)(4)(A).

> **2.  Per §1843(k)(5) the Board of Governors of the Federal Reserve System is required to define activities as being financial in nature when they do not involve money or a security. Cryptocurrency is neither.**

BAM next suggests that the financial activities described under 12 U.S.C.A. § 1843(k)(4)(A) support its contention that it is a "financial institution" but fails to examine the express limitations defined within the section itself:

> **(5) Actions required**
>
> **(A) In general**
>
> The Board shall, by regulation or order, define, consistent with the purposes of this chapter, the activities described in subparagraph (B) as financial in nature, and the extent to which such activities are financial in nature or incidental to a financial activity.
>
> **(B) Activities**
>
> The activities described in this subparagraph are as follows:
>
> (i) Lending, exchanging, transferring, investing for others, or safeguarding financial assets *other than money or securities.*
>
> (ii) Providing any device or other instrumentality for transferring money or other financial assets.
>
> (iii) Arranging, effecting, or facilitating financial transactions for the account of third parties.

12 U.S.C.A. § 1843(k)(5) (West). As noted, cryptocurrency is not legal tender. *Atwal*, 2022 WL 327471, at \*4.  Digital assets and cryptocurrency, standing alone, are also not securities. "Cryptocurrencies (sometimes called tokens or digital assets) are a lawful means of storing or transferring value and may fluctuate in value as any commodity would. In the abstract, an investment of money in a cryptocurrency utilized by members of a decentralized community

connected via blockchain technology, which itself is administered by this community of users rather than by a common enterprise, is not likely to be deemed a security." *Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020).

Cryptocurrency is therefore not "money or securities," and Plaintiff's counsel's research has not revealed any FRB order or regulation defining the purchase and sale of cryptocurrency as being "financial in nature" under 12 U.S.C.A. § 1843(k)(5)(A). Without satisfying this prerequisite, BAM's argument fails with regard to conducting "financial activities" and ultimately meeting the definition of a financial institution under the GLBA.

**3.    The Board of Governors of the Federal Reserve System has not determined by Order which was in effect on November 12, 1999 that BAM's Activity is closely related to banking.**

Next BAM attempts to argue that they are engaged in "[an] activity that the [Federal Reserve Board] has determined, by order or regulation that is in effect on November 12, 1999, to be so closely related to banking or managing or controlling banks as to be a proper incident thereto." 12 U.S.C.A. § 1843(k)(4)(F). BAM states that they are a "money transmitter" under the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN)[4] regulations, and this definition includes "money transmission services." BAM essentially contends that because a 1995 order[5] from the FRB stated that "domestic money transmission services are closely related to banking" that they satisfy the requirements of 12 U.S.C.A. § 1843(k)(4)(F). (BAM's Motion to Dismiss, Pg. 7-8).

---

[4] FinCEN currently has approximately 24,000 business who self-register and report to the agency. *Fact Sheet on MSB Registration*, Financial Crimes Enforcement Network, accessed February 10, 2022, https://www.fincen.gov/fact-sheet-msb-registration-rule. The businesses currently registered include supermarkets, liquor stores, cash-check businesses, grocery stores and gas stations. The publicly available FinCEN registration for BAM (BAM's Motion to Dismiss, Ex. F) also makes it clear that "[t]he inclusion of a business on the MSB Registrant Search Web page is not a recommendation, certification of legitimacy, or endorsement of the business by any government agency."

[5] *Orders Issued Under Section 4 of the Bank Holding Company Act*, 81 Fed.Res.Bull. 1130, 1130, 1995 WL 736783.

As an initial matter, digital assets are *not* money, and therefore BAM is not engaged in "money transmission services."  But BAM's argument fails for at least two additional reasons. **<u>First</u>**, cryptocurrency and their corresponding exchanges did not exist in 1995 when the FRB issued the order regarding "domestic money transmission services." BAM assumes without evidence that the FRB at the time would have contemplated cryptocurrency activity as being "money transmission services" that were "closely related to banking." The 1995 order BAM references is based on an analysis of the Norwest Corporation, which was a bank holding company that merged with Wells Fargo in 1998 and was engaged in traditional banking services.[6] Because BAM cannot argue that they are engaged in "domestic money transmission services" as described by the FRB decades ago their argument fails.

**<u>Second</u>**, the sole authority provided for BAM's assertion that they provide "money transmission services" is not found under an FRB order, but rather FinCEN's definition for "money transmitter" under the Code of Federal Regulations. FinCEN's own definition of "money transmitter" however did not include the terms "money transmission services" within the definition prior to November 12, 1999. *See* 64 FR 45438-01, 1999 WL 631524(F.R.). This includes the final definition of "money transmitter" that went into effect on September 20, 1999. *Id*. at 22, 26. Therefore, even assuming that the financial activities of a FinCEN "money transmitter" were considered in the FRB's 1995 order, BAM's argument that their current services were previously ruled by the FRB to be "closely related to banking" is misleading. Consequently, BAM's argument that they are necessarily a "financial institution" due to 12 U.S.C.A. § 1843(k)(4)(F) fails and the Motion to Dismiss should be denied.

---

[6] Timothy L. O'Brien, *Wells Fargo And Norwest Plan Merger*, THE NEW YORK TIMES (June 9, 1998), https://www.nytimes.com/1998/06/09/business/wells-fargo-and-norwest-plan-merger.html (last visited April 24, 2022).

4. **Even if BAM is found to be a "financial institution" under 12 U.S.C.A. § 1843(k), it cannot fall within exception 25(c) of BIPA because GLBA regulators lack rulemaking authority for cryptocurrency exchanges and there are no "rules promulgated thereunder."**

Even if the Court determines that BAM is a "financial institution," an extensive analysis of the term under 12 U.S.C.A. § 1843(k) is not required. Since the GLBA regulators lack authority to promulgate rules under the GLBA, there are no rules "promulgated" for a cryptocurrency exchange under the Act. Consequently, the plain meaning of the BIPA 25(c) exception, which excludes financial institutions which are "subject to Title V of the federal Gramm-Leach-Bliley Act of 1999 and the rules promulgated thereunder," cannot apply to a cryptocurrency exchange. This Court would have to be the first Court to reach such a conclusion.

The GLBA is clear that agencies who have been granted rulemaking authority under § 6805(a) of the GLBA "shall establish appropriate standards for the financial institutions subject to their jurisdiction [...]." 15 U.S.C.A. § 6801(b). However, no agency has been granted rulemaking authority over the spot transactions of a cryptocurrency exchange. These agencies have admitted, as recently as a few months ago, that they lack appropriate rulemaking authority for cryptocurrency exchanges. For example, in May 2021, SEC Chair Gary Gensler testified that "[r]ight now the exchanges trading in these crypto assets do not have a regulatory framework, either at the SEC or our sister agency, the Commodity Futures Trading Commission" and "there's not a market regulator around these crypto exchanges."[7] As recently as February 9,

---

[7] Avi Salzman, *Cryptocurrency Exchanges Need Direct Regulation, SEC Chair Says*, BARRON'S (May 6, 2021), https://www.barrons.com/articles/cryptocurrency-exchanges-regulation-sec-coinbase-51620335275 (last visited April 24, 2022).

2022, CFTC Chairman Rostin Benham stated that, concerning the digital asset marketplace, "the CFTC does not have direct statutory authority to regulate cash markets […]."[8]

The issue of rulemaking authority versus enforcement authority under BIPA's 25(c) exception was recently discussed in *Patterson v. Respondus, Inc.*, No. 20 C 7692, 2022 WL 860946, at *1 (N.D. Ill. Mar. 23, 2022). In *Patterson*, defendant Lewis University argued that they fell under the BIPA 25(c) exception due to the FTC's enforcement authority. *Id*. at 21. While the Court acknowledged that the FTC also had rulemaking authority under the GLBA, it stated that the rulemaking authority granted to the FTC was "plainly too narrow to cover an institution like Lewis." *Id*. Ultimately, the Court declined to dismiss the BIPA case against Lewis University and rejected Lewis University's argument that they fell under the 25(c) exception of BIPA.

It is not disputed that the CFTC has anti-fraud and manipulation enforcement authority over virtual currency and cash markets. *See Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y.). However, the CFTC has not been granted *rulemaking authority* over virtual currency and cash markets- a fact acknowledged by the CFTC itself.

But even *if* the CFTC had complete rulemaking and regulatory control of virtual currency and cash markets, BAM would still not be a "financial institution" under the GLBA. *See* 15 U.S.C.A. § 6809(3)(B) (West) ("Persons subject to CFTC regulation**")** ("Notwithstanding subparagraph (A), the term 'financial institution' does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures

---

[8] Paul Kiernan, *CFTC Chair Asks Congress for Authority to Regulate Some Cryptocurrencies*, WALL STREET JOURNAL (February 9, 2022), https://www.wsj.com/articles/cftc-chair-to-testify-on-cryptocurrencies-as-congress-weighs-legislation-11644414710 (last visited April 24, 2022).

Trading Commission under the Commodity Exchange Act.").  The only exception to this rule is found in § 7b-2 of the Commodity Exchange Act, which states that "[n]otwithstanding [15 U.S.C.A. § 6809(3)(B)], any futures commission merchant, commodity trading advisor, commodity pool operator, or introducing broker that is subject to the jurisdiction of the Commission under this chapter with respect to any financial activity shall be treated as a financial institution for purposes of title V of such Act with respect to such financial activity." 7 U.S.C.A. § 7b-2 (West).  BAM is not a futures commission merchant, commodity trading advisor, commodity pool operator, or introducing broker and cannot argue otherwise.

For these reasons, BAM does not meet the BIPA 25(c) exception as they are not "subject to Title V of the federal Gramm-Leach-Bliley Act of 1999 and the rules promulgated thereunder."

**B.    Plaintiff has adequately pled his BIPA violations against BAM and BAM's Motion to Dismiss should be denied.**

*i.*    **The Conduct Alleged Occurred Primarily and Substantially in Illinois**

Defendant BAM argues in their Motion to Dismiss that Plaintiff has not made sufficient allegations within his complaint to establish that the BIPA violation occurred primarily and substantially in Illinois.  But Plaintiff has alleged within his complaint that 1) to create an account mobile users were required to download BAM's application (FAC ¶ 7), 2) that Defendant Jumio integrated their software within BAM's application (FAC ¶ 24), 3) users were prompted to take a unique type of selfie with their mobile, cellular or desktop device (FAC ¶ 24), 4) that the user's own camera was activated (FAC ¶ 29), that Plaintiff was required to submit a photograph of his face (FAC ¶ 30), 5) that the images were used to collect biometric identifiers and geometry of a user's facial features (FAC ¶ 24), and 6) that Plaintiff downloaded BAM's

application, created his account and took and uploaded his photo all while he was present in

Cook County, Illinois (FAC ¶ 26).[9]

These facts are sufficient to state a claim for relief under BIPA.  As the Court explained

in *Monroy v. Shutterfly, Inc.,* No. 16 C 10984, 2017 WL 4099846, at *6 (N.D. Ill. Sept. 15,

2017):

> Here, some of the circumstances relating to Monroy's suit are alleged to have
> occurred in Illinois: the complaint alleges that the photo of Monroy was uploaded
> to Shutterfly's website from a device that was physically located in Illinois and had
> been assigned an Illinois-based IP address. Monroy also alleges that the photo was
> uploaded by a citizen of Illinois. In addition, he maintains that the actual violation
> of the statute took place in Illinois because that is where Shutterfly failed to obtain
> the requisite release prior to allegedly collecting his biometric data. At the same
> time, other relevant circumstances point to locations outside of Illinois: Monroy
> himself is a citizen and resident of Florida, and Shutterfly is a Delaware corporation
> headquartered in California. Moreover, Shutterfly argues while Monroy claims that
> the alleged violation took place in Illinois, he does not claim to have suffered any
> injury in Illinois.
>
> However, the location of other important circumstances is as yet undetermined.
> For example, it is unclear where the actual scan of Monroy's face geometry took
> place, and where the scan was stored once it was obtained. Answers to these
> questions require a fuller understanding of how Shutterfly's facial recognition
> technology operates. In addition, these factual questions potentially raise legal
> questions that the parties have not addressed. (For example, given that Monroy's
> biometric data was extracted and stored in cyberspace, how is their physical
> location to be determined?).
>
> In short, the court is unable at this time to determine whether the circumstances of
> Monroy's claim can be said to have occurred primarily and substantially in
> Illinois, and thus whether Monroy's suit would require extraterritorial application
> of BIPA. At this stage, therefore, the court is not persuaded by Shutterfly's
> extraterritoriality argument.

*Id.* at 6 (internal citations omitted); *see also Rivera v. Google Inc.,* 238 F. Supp. 3d 1088, 1101–

02 (N.D. Ill. 2017) ("According to Rivera and Weiss, all of the following are Illinois

---

[9] For these same reasons, BAM's argument that Plaintiff improperly lumps the Defendants together is incorrect:
Plaintiff alleges that he downloaded *BAM's* app, created an account in *BAM's* app, and that *BAM's* app, along with
Jumio's software integrated therein, collected and processed his biometric identifiers.

connections: Rivera and Weiss are Illinois residents; Rivera's and Weiss's photographs were taken in Illinois; and Rivera's and Weiss's photographs were allegedly "automatically uploaded in Illinois to the cloud-based Google Photos service ... from an Illinois-based Internet Protocol ('IP') address," Rivera and Weiss also allege that it was in Illinois where Google failed to provide Rivera and Weiss with required disclosures and failed to get Rivera's and Weiss's consent. At this stage of the proceedings we take the Plaintiffs' allegations as true, and these alleged facts tip toward a holding that the alleged violations primarily happened in Illinois").

Even if additional facts would be necessary, federal courts have ruled on multiple occasions that, when analyzing the supposed extraterritoriality of a BIPA claim that "this is a highly fact-based analysis that is generally inappropriate for the motion to dismiss stage." *Vance v. Int'l Bus. Machines Corp.*, No. 20 C 577, 2020 WL 5530134, at *3 (N.D. Ill. Sept. 15, 2020); *see also Rivera*, 238 F. Supp. 3d at 1102 ("the Court concludes that the Plaintiffs sufficiently allege facts that would deem the asserted violations as having happened in Illinois. But there is no bright-line rule for determining this, so the parties will have the chance to develop more facts during discovery").

BAM cites *McGoveran v. Amazon Web Servs., Inc*., No. CV 20-1399-LPS, 2021 WL 4502089 (D. Del. Sept. 30, 2021) claiming it is directly on point. However, *McGoveran* is highly distinguishable. In *McGoveran*, the plaintiffs brought an action against Amazon under BIPA claiming that the customer service telephone calls made from Illinois resulted in a "voiceprint" that captured biometric data. *Id*. at 4. But the Court reasoned that there was "nothing to suggest their 'voiceprints' were created, possessed, or stored ... in Illinois" and "[n]othing about this process occurred in Illinois except for the initial dialing of the phone by Plaintiffs." *Id*. at 4-5. In the present case, the Plaintiff has pled that BAM's app was installed on his iPhone, which

13

contained Jumio's integrated software. (FAC ¶ 24). Using this software, Plaintiff "created an account while he was present in Cook County, Illinois." (FAC ¶ 26). While creating an account, the software enabled Plaintiff's iPhone camera so that he could take a "unique type of 'selfie'" which was then "used to collect certain biometric identifiers and geometry of the user's facial features." *Id.* Additionally, Plaintiff has also alleged that that the software stated "[s]canning completed" after taking the selfie. (FAC ¶ 30).  In short, this was not a normal photograph taken and processed with the Plaintiff's iPhone, nor was it a call placed to a number outside Illinois.

     **ii.**    **The Choice of Law Provision in BAM's Terms of Use Does Not Apply Because Plaintiff Was Never Presented With Them, Required to Manifest Any Affirmative Assent to Them, or Even Informed That They Exist**

BAM's argument that the California choice of law provision in its TOU governs Plaintiff's claims here suffers from a fatal flaw: Plaintiff never agreed to those terms, and no contract was ever formed.  BAM does not contend that Plaintiff was presented with the TOU when he signed up for his account, or that he had to take any affirmative action indicating that he agreed to them during the account creation process, or that he was ever even alerted that they exist.  Instead, BAM pejoratively derides that "Plaintiff alleges for the first time in the FAC that he was 'not required to scroll through these Terms of Use during the account creation process and proper assent' – *whatever that means* – 'was not otherwise obtained.'"  Br. at 11 (emphasis added).  Here is what it means.

"A contract for sale or purchase requires mutual assent to the terms of the contract." *Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016) (citing *Forest Preserve Dist. Of Du Page County v. Brookwood Land Venture,* 229 Ill.App.3d 978, 983 (2d Dist. 1992)).  As the Seventh Circuit has explained:

14

> Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement. This is not hard to accomplish, as the enormous volume of commerce on the Internet attests. A website might be able to bind users to a service agreement by placing the agreement, or a scroll box containing the agreement, or a clearly labeled hyperlink to the agreement, next to an "I Accept" button that unambiguously pertains to that agreement. There are undoubtedly other ways as well to accomplish the goal. Somehow or other, however, TransUnion needed to get the message through to the site user that purchasing a consumer credit score means agreeing to the Service Agreement. It failed to do so in this case . . . .

*Sgouros*, 817 F.3d at 1036. As another court in the Northern District of Illinois has usefully summarized:

> Courts often divide web-based contracts into two different categories, differentiated by the manner in which users demonstrate assent. "Clickwrap" agreements "require users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). Clickwrap agreements are usually upheld by courts "because they present the consumer with a realistic opportunity to review the terms of the contract ***and*** they require a physical manifestation of assent." *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 465 (S.D.N.Y. 2017). The other category of online contract is the "browsewrap" agreement, which typically involves "a situation where notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via hyperlink." *Van Tassell*, 795 F. Supp. 2d at 790 (internal quotation marks omitted). In other words, a user demonstrates her assent simply by using the website. *Id.* Because a browsewrap agreement requires no affirmative action "by the website user to agree to the terms of a contract other than ... her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.*

*Wilson v. Redbox Automated Retail*, LLC, 448 F. Supp. 3d 873, 882 (N.D. Ill. 2020) (emphasis in original), *appeal dismissed*, No. 20-1678, 2021 WL 1649781 (7th Cir. Jan. 26, 2021).

Here, BAM's TOU cannot possibly constitute a "click-wrap" agreement, as Plaintiff was never, at any time, asked or required to click any button or make any other affirmative manifestation of consent to the TOU. While the account creation process included a page stating "[b]y clicking "Continue" you consent to *Jumio* collecting and disclosing your biometric data

15

pursuant to its Privacy Policy," FAC ¶ 35, there is no such disclaimer related even to BAM's *Privacy Policy* (which does not contain any choice of law provision), let alone its TOU.

The TOU, then, is a "browsewrap" agreement, as BAM concedes.  Br. at 11 (arguing that account creation and use of website, without any further confirmation of consent, constitutes agreement to TOU).  But the mere existence of such terms on some section of the website, when not presented to the customer (as apparently happened here) is wholly insufficient to form any binding agreement.  In fact, Illinois courts, including the Seventh Circuit, have found such purported agreements insufficient even when the sign-up screen itself contains a disclosure that continuing with the transaction constitutes agreement to the terms of use, and even when there is a hyperlink for the customer to view those terms of use, neither of which occurred here.  *See, e.g., Wilson*, 448 F. Supp. 3d at 885-886 ("The main problem with the Sign In screen is that the hyperlink to the Terms of Use is not reasonably conspicuous . . .  the Court finds that the disclosure on the Sign In screen failed to give Wilson constructive notice of the Terms of Use"); *Sgouros*, 817 F.3d at 1035 ("the web pages on which Sgouros completed his purchase contained no clear statement that his purchase was subject to any terms and conditions of sale. The scroll box contained the visible words 'Service Agreement' but said nothing about what the agreement regulated. The hyperlinked version of the Service Agreement was not labeled 'Terms of Use' or 'Purchase' or 'Service Agreement,' but rather just 'Printable Version.' And even indulging in the assumption that all visitors to this website are capable of reading the half-line of text, the visible words 'This Service Agreement ... contains the terms and ... conditions upon which you ... may access and use ...' fall short of providing notice that the purchase of a consumer credit score is subject to the agreement").

16

In this case, not only did BAM fail to give Plaintiff notice that creating an account would bind him to the TOU, it never even alerted Plaintiff to the very *existence* of the TOU.  Instead, the only indication that the TOU would govern the transaction at all is in the TOU itself, which was never presented to Plaintiff.  This is not sufficient to create constructive notice.   *Cf. E.K.D. ex rel. Dawes v. Facebook, Inc.,* 885 F. Supp. 2d 894, 901 (S.D. Ill. 2012) ("absent a showing of actual knowledge of the terms by the webpage user, the validity of a browsewrap contract hinges on whether the website provided reasonable notice of the terms of the contract. In this instance, as noted, persons wishing to join facebook.com must attest that they have read Facebook's TOS, which are made available through a hyperlink. Also, Facebook's TOS are hyperlinked on every page accessed by a facebook.com user in underlined, blue text that contrasts with the white background of the hyperlink"); *Fischer v. Instant Checkmate LLC,* No. 19 C 4892, 2021 WL 3033586, at *2 (N.D. Ill. July 19, 2021) ("Admissible evidence therefore shows that, when Adams entered her name and email on a registration form on Instant Checkmate's website in August 2013, the webpage stated that clicking 'Continue' constituted acceptance of Instant Checkmate's Terms of Use"); *Miracle-Pond v. Shutterfly, Inc.*, No. 19 CV 04722, 2020 WL 2513099, at *4 (N.D. Ill. May 15, 2020) ("Here, Shutterfly's page presented the Terms of Use for viewing, stated that clicking 'Accept' would be considered acceptance of the Terms of Use, and provide both an 'Accept' and 'Decline' button"); *Forby v. One Techs., LP*, No. 15-0757-DRH-PMF, 2016 WL 11746078, at *7 (S.D. Ill. Mar. 25, 2016) ("The Court finds that One Technologies' website and sign-up process provided sufficient notice to consumers that, by completing the sign-up process, they would be bound by One Technologies' Terms and Conditions. The hyperlink to the Terms and Conditions is on every single webpage a prospective customer must fill out in order to complete the sign-up process . . . .  Except for the first page,

17

these hyperlinks are underlined and presented in blue font, contrasting a grey background . . . . The majority of the hyperlinks are directly below the button on each page that the prospective customer must click in order to proceed with the sign-up process . . . .  Moreover, the hyperlink on the Step 2 Webpage is contained within text directly above the 'Continue' button that a user must press in order to continue the sign-up process").

BAM's argument that the mere existence of the TOU, without any notice whatsoever to Plaintiff, created a binding contract is therefore entirely contrary to governing Seventh Circuit law, and the choice of law provision contained therein is unenforceable.  And even if BAM had given Plaintiff *some* notice of those terms, which it apparently did not, there is no indication at all that such notice would have been sufficiently conspicuous so as to bind a reasonable person, particularly in light of Plaintiff's well-pled allegation that Defendants employed no such mechanism for obtaining consent.  *See, e.g., Wilson, Sgouros, supra*.

In any event, assuming *arguendo* Plaintiff *had* agreed to the Terms of Use, they would not preclude him from asserting his BIPA claims under Illinois law, as enforcing the contractual choice-of-law provision would violate Illinois' fundamental policy, and Illinois has a materially greater interest in the litigation.  *See Hogan v. Amazon.com, Inc*., No. 21 C 3169, 2022 WL 952763, at *5 (N.D. Ill. Mar. 30, 2022) ("Because the Court finds that the choice-of-law provision violates fundamental Illinois' [*sic.*] public policy, the Court does not reach Plaintiffs' additional arguments . . . . Illinois has the greater material interest in this dispute and the Court will not enforce the choice-of-law provision. Hogan's claims will be evaluated using Illinois law under BIPA"); *In re Facebook Biometric Information Privacy Litigation*, 185 F.Supp. 3d 1155, 1169 (N.D. Cal. 2016) (finding that BIPA is a "fundamental policy of the state of Illinois," declining to apply California law); *Patterson*, 2022 WL 860946, at *16 ("Because Illinois has

18

enacted BIPA, and Washington is connected to this dispute only by virtue of the Defendant's domicile, Illinois has a materially greater interest in the litigation. The court therefore declines to enforce the choice-of-law provision").

### *iii*.   The Class Action Waiver is Unenforceable for the Same Reason as the Choice of Law Provision

BAM's argument that "by accepting BAM's TOU, Plaintiff has waived all rights to assert class action claims against BAM," Br. at 19, fails for the same reason as its choice of law argument: Plaintiff never "accept[ed]" BAM's TOU at all, and therefore the terms contained in that document do not govern the parties' relationship.  *See supra*, Section I(B)(ii).

### *iv*.   Plaintiff Has Stated a Claim for Unjust Enrichment and the Defendants Have Been Unjustly Enriched.

To state a claim for unjust enrichment under Illinois law, a plaintiff must establish: "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Womack v. Brady Mccasland, Inc.*, No. 15-CV-638-DRH-PMF, 2016 WL 1117086, at *2 (S.D. Ill. Mar. 22, 2016). In this case, Plaintiff has alleged that users were required to submit their biometric data in order to create and verify an account on Binance.US. (FAC ¶ 8). As argued extensively above, the process for the submission of this biometric data was improper under BIPA to the detriment of Plaintiff and its users. This detriment resulted in the creation of a Binance.US account (FAC ¶ 68) for which BAM was able to collect and retain fees from "sales and transfers" of digital assets (FAC ¶ 69). Without this detriment, no account would have been created and no fees would have been received by BAM. As outlined within Womack, this "violates the fundamental principles of justice, equity, and good conscience."

## CONCLUSION

Based on the foregoing, BAM's motion to dismiss should be denied in its entirety.

Dated:  April 29, 2022

<div style="margin-left:2em;">

**FREEARK, DENNIS, MURPHY & MOSKOP, P.C.**

BY:     */s/ Joel D. Beckwith*
JOEL D. BECKWITH
SHANE M. MOSKOP
115 W. Washington Street, P.O. Box 546
Belleville, IL 62222-0546
jbeckwith@freeark.com
smoskop@freeark.com
618-233-2686 - 618-233-5677(fax)

**LYNCH CARPENTER, LLP**
KATRINA CARROLL
KYLE SHAMBERG (application for admission pending)
111 W. Washington Street
Suite 1240
Chicago, IL 60602
katrina@lcllp.com
kyle@lcllp.com
312-750-1265 - 773-598-5609 (fax)

*Attorneys for Plaintiff and the Putative Class*

</div>